IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WISCONSIN INTERSCHOLASTIC ATHLETIC
ASSOCIATION, AMERICAN HI-FI, INC.,

        Plaintiffs,

        v.

GANNETT CO., INC. and
WISCONSIN NEWSPAPER ASSOCIATION, INC.,

        Defendants.

Case No. 09-CV-155

**DEFENDANTS' RESPONSE TO THE
AIA'S AND NFHS' AMICUS CURIAE BRIEFS**

The amicus curiae briefs filed by the Arizona Interscholastic Association, Inc. ("AIA") and the National Federation of State High School Associations ("NFHS") touch on the issues before the Court in only broad, conclusory terms. Although both organizations claim to have an independent interest in the outcome of this case, neither organization provides the Court with a legal or factual framework for the Court to evaluate those interests.

**ARGUMENT**

**I.    THERE ARE NO FACTS BEFORE THE COURT ABOUT THE CONSTITUTIONAL STATUS OF OTHER INTERSCHOLASTIC ASSOCIATIONS.**

The NFHS describes itself as the "national service and administrative organization of high school athletics." Brief of Amicus Curiae National Federation of State High School Associations in Support of Plaintiffs' Motion for Summary Judgment (Dkt. #111) ("NFHS Br.") at 2. Its membership, with one interscholastic athletics or activities association from each of the 50 states and the District of Columbia, supports that description. *Id.* As such, it would have

1

been the ideal party to provide the Court with comprehensive legal and factual background about the potential scope of the Court's decision in this case. It did not.

> The NFHS will leave it to the parties to address the legal issues raised by these [constitutional] arguments. This brief will instead focus on the practical reasons why contracts like those at issue here should be valid, and the consequences of holding otherwise.

*Id.* at 3-4.

But the "consequences of holding otherwise" cannot be determined in a vacuum. The determination that an interscholastic athletic association is a state actor, for example, is a fact-intensive inquiry that depends on the association's revenue sources, the identity of its membership, and the recognition, if any, it receives from the state. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 291-92 (2001). The WIAA has admitted state actor status for purposes of this case only, leaving itself free, somehow, to dispute the issue in another case against another party.

The NFHS does not address or even acknowledge, as a preliminary matter, that only its state-actor members are subject to constitutional restrictions so that only its state-actor members could be affected, in any way, by the Court's decision in this case. How many other NFHS members deny state actor status? How many have considered constitutional requirements in establishing their media policies? The NFHS doesn't say. The AIA similarly sidesteps this fundamental first step and merely implies, without actually admitting, that it is a state actor by claiming to have an interest in the outcome of this case. Brief of Amicus Curiae Arizona Interscholastic Association, Inc. in Support of Plaintiffs' Motion for Summary Judgment (Dkt. #95) ("AIA Br.") at 3.

The "practical" benefits of a contract have a different legal significance for a state actor than for a private entity. Not only do the AIA and the NFHS not address state actor status, they

2

also do not acknowledge that a state-actor association is bound by the Constitution and is fundamentally different from a private entity. The Court should reject the amici's invitation to consider their alleged interests in protecting the value of "the product they have produced" in the absence of sufficient facts and legal analysis to clarify the AIA's and other associations' respective constitutional status and organization. AIA Br. at 7.

## II. THE AMICI DO NOT EXPLAIN THE TRUE FINANCIAL VALUE OF EXCLUSIVE MEDIA CONTRACTS.

The AIA does not operate under the same business model as the WIAA. Unlike the WIAA, for example, the AIA uniformly prohibits *all* media organizations from live broadcasting from the event venue and, in particular, from live Internet streaming. AIA Br. at 3, 5. Because the AIA does not discriminate among media companies, the outcome in this case would not shed light on the constitutionality of its policies.

Currently, the AIA does not have any exclusive media contracts and the only productions of AIA events available to the public are those the AIA transmits on its own website.[1] *Id.* at 5-6. Those productions have some commercial value for the AIA and it calculates that it has made close to $150,000 from sponsors and advertisers to its website since September 2009. *Id.* at 6.

That revenue, however, is not a true indication of the value to the AIA of preventing other parties from entering the market and "diluting AIA's viewership." *Id.* at 7. To determine that real-world value, the AIA would have had to disclose to the Court its gross annual revenues at the very least. The value to the WIAA of all its exclusive rights contracts together, for example, is only 3.3% of its total revenue and the value to the WIAA of its WWWY contract is a

---

[1] In the absence of exclusive contracts, the AIA's fear that it could be harmed by the outcome of this litigation is speculative. The AIA's interest in the outcome of this litigation appears to be limited to its desire to reenter the exclusive contract marketplace at some undisclosed point in the future. *See* AIA Br. at 8.

3

mere 2.0% of its total revenue.[2]  Pls.' Resp. to Defs.' Supplemental Proposed Findings of Fact (Dkt. #103) ("Pls.' Resp. to Defs.' SFOF"), Fact and Resp. No. 15.  "Exclusivity adds value," the AIA claims.  AIA Br. at 7.  How much value is added, however, and how much economic distress the association would suffer, if any, from losing that value, is left to speculation.

The NFHS' brief is even less helpful in this regard.  Other than facts about the WIAA that are already part of the record in this case, the NFHS does not address any member's experiences with Internet streaming or exclusive media contracts.  The association merely asserts that state associations are increasingly "trying to maximize revenue…by selling the licensing rights to…popular state-wide sporting events."  NFHS Br. at 4.  The NFHS fails to cite the basis for this fact, but it appears to be found in a single two-sentence paragraph of the Affidavit of Robert F. Kanaby:

> It is common for state associations to enter into media contracts in which they sell the licensing rights to broadcasts of sporting events.  To maximize their value, associations often grant exclusive licensing rights in these contracts.

Dkt. 114, ¶ 7.[3]  But the NFHS offers no facts to show how many of its members have media contracts; how many of those contracts are exclusive rights contracts; what technologies are covered by those contracts; whether there are any other NFHS member associations with

---

[2]     This figure actually overstates the value to the WIAA of the WWWY contract.  The figure was calculated by including an $80,000 sponsorship payment only an unspecified portion of which is attributable to WWWY.  Pls.' Resp. to Defs.' SFOF, Fact and Resp. 12; Affidavit of Todd C. Clark, Jan. 19, 2010 (Dkt. #54), ¶ 10.

[3]     It would be charitable to call the foundation for Kanaby's testimony in ¶¶ 4-8 of his affidavit thin.  The only testimony that he asserts as a basis for his conclusions about state associations' experience with exclusive contracts and revenue motivations is that he is the NFHS Executive Director, ¶ 1, and that he reviewed Dr. Hoyt's affidavit, ¶ 3.  Kanaby also qualifies his testimony as being "true to the best of my knowledge, information and belief."  Such a qualification raises questions that some of the testimony, whose foundation is thin at best, was made on information and belief instead of personal knowledge as required by Rule 56(e).  Testimony made on information and belief is not admissible in support of a summary judgment motion.  *Murphy v. Ford Motor Co.*, 170 F.R.D. 82, 84-85 (D.Mass. 1997) (striking portions of affidavit based on information and belief rather than personal knowledge).

exclusive Internet streaming contracts; whether any members bid those contracts; or how NFHS member associations raised revenue before they entered into exclusive rights contracts.

The significance of these facts is hard to overstate. The record suggests that mobile Internet streaming technology has only recently become available. For example, Gannett did not make such technology available to its local newspapers until Summer 2008, Declaration of Joel Christopher, Jan. 22, 2010 (Dkt. #36), ¶¶12-13; WWWY was apparently unable to live stream until Spring 2007, two years into its contract with the WIAA, and claims that to date it makes no money from its streaming, Affidavit of Tim Eichorst, Jan. 15, 2010 (Dkt. #55) ("Eichorst Aff."), ¶¶ 20-21; finally, the AIA only began live Internet streaming to its website about six months ago, in September 2009, Schmidt Decl., ¶ 12.

In the absence of any concrete facts about other NFHS members' restrictions on the use of such a new technology or any members' new-found reliance on revenue that is enhanced because of those restrictions, the NFHS' conclusions about exclusive Internet streaming contracts are speculative. The NFHS asserts, without any factual support, for example, that state associations' use of licensing agreements such as those challenged by the defendants make state-wide events in all sports possible. NFHS Br. at 7; *see also id.* at 6 (without exclusive rights revenue, the WIAA would be "hard-pressed to afford championship events for all sports"). The NFHS further implies that without such revenue associations would be unable to subsidize less popular sports and "high school sports as a whole, and American secondary education, will suffer." *Id.* at 7. This is groundless hyperbole that adds nothing to an understanding of the issues before the Court or to the NFHS' interests in the outcome of the case.

Not only does the NFHS fail to bring any new facts to the Court's attention, the NFHS misstates the record and issues. The NFHS attempts to support its conclusion that exclusive

media contracts highlight and promote the value of high school athletic competition, by increasing the public's access to those events, by asserting that Dr. Hoyt has explained that "WWWY was willing to broadcast *all* WIAA events over the internet."  NFHS Br. at 7 (citation omitted).  This is false.  Rather, Dr. Hoyt correctly stated that WWWY obtained exclusive "internet streaming rights to all…regional and sectional events…and all State Tournament events (i.e., finals) excluding football, basketball, and hockey finals."  Declaration of James L. Hoyt, PhD in Support of Pls.' Motion for Summary Judgment, Jan. 12, 2010 (Dkt. #56), ¶ 20.  WWWY's contract with the WIAA gives WWWY the rights to all those events, but does not obligate WWWY to actually produce any.  Eichorst Aff., Ex. C at II(a) (setting forth production "goals").  As the record shows, WWWY's coverage of WIAA events has been paltry: during the 2008-09 academic year, only 3.7% of events covered by WWWY's contract were produced by WWWY or an affiliate.  Pls.' Resp. to Defs.' SFOF, Fact and Resp. 32.

The NFHS also misstates that the defendants are seeking "unrestricted access" to WIAA events.  NFHS Br. at 9.  They are not.  The defendants are merely seeking an opportunity to use the reporting technologies and techniques of their choice on an equal basis with other media.  Finally, the NFHS also mischaracterizes the status of the defendants' challenge to the WIAA's photography policies.  *Id.*  The WIAA no longer has, or enforces, a policy to restrict the media companies' sale of photographs taken at events.  *See* Brief in Support of Defs.' Mot. for Summ. J. on Their Counterclaim (Dkt. #32) at 3 (discussing status of photography policy).

### III. NEITHER AMICI IDENTIFIES A VALID NON-FINANCIAL REASON FOR LIMITING TRANSMISSION RIGHTS.

It is not the place of a state actor to define what "true reporting entails."  NFHS Br. at 9.  The First Amendment leaves those judgments to editors.  The NFHS' opinion that exclusive licenses such as those at issue are at most "inconsequential" restrictions on the defendants' rights

6

is irrelevant. *Id.* at 10.  The NFHS provides no support for its claim that these restrictions "are all the more inconsequential when weighed against the benefit of the contracts to the state athletic associations and to high school sports as a whole." *Id.*  The amici's failure to bring forth enough facts to justify their claim of a financial benefit from these contracts was discussed above; the amici equally fail in their attempt to prove legitimate non-financial benefits.

    First, the AIA's and NFHS' safety concerns simply have nothing to do with exclusive media contracts.  NFHS Br. at 8; AIA Br. at 9-11.  The AIA can impose numerical limits on the number of reporters permitted at an event through its credentialing requirement, to promote safety, and allocate the credentials to interested reporters by applying neutral criteria equally to all without entering into an exclusive contract.  Some of the AIA's other safety concerns are simply not developed enough factually to understand what steps, if any, the AIA might take to minimize potential risks to its student-athletes.  An image from an AIA-sponsored event that could result in a potential stalking threat, for example, can come as easily from a rogue photographer as from a screen capture of a broadcast produced under an exclusive contract.  AIA Br. at 10-11.

    Second, other benefits, such as advertising restrictions, are not valid restrictions for a state actor.   NFHS Br. at 8; AIA Br. at 8-9.  The AIA argues that an exclusive rights contract allows an association to extract promises from the rights holder to play public service announcements or restrict the content of their advertising.  AIA Br. at 8-9.  The AIA does not cite any legal authority to support this startling claim that a state actor may leverage exclusivity to force or restrict speech about public events it sponsors.  Other examples include NFHS members' alleged interests in avoiding an association between high school sports and internet streamers "who may create an inferior product," or members' alleged interests in giving an

7

exclusive licensing partner "a financial interest in investing in their enterprise and doing a more professional job." NFHS Br. at 8. Although a private actor may undoubtedly be able to pursue those goals, the NFHS fails to address the legal basis for asserting that a state actor may do the same.

## CONCLUSION

The amici briefs filed by the AIA and NFHS contain erroneous and largely irrelevant arguments that add little value to the parties' extensive briefing in this case. The amici do not bring forth facts that would allow the Court to determine how broad the effect of a ruling in this case would be nor do they explain the real-world value of an exclusive Internet streaming contract like the one the defendants are challenging in this case. Whatever unique interests and perspectives these organizations may have on the issues and on the magnitude of this case, the AIA and NFHS have failed to bring those to the Court's or the parties' attention.

Dated:  March 5, 2010.

*s/Monica Santa Maria*
Robert J. Dreps
Monica Santa Maria

GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Post Office Box 2719
Madison, WI  53701-2719
Phone:   608-257-3911
Fax:       608-257-0609
Email:   rdreps@gklaw.com

*Attorneys for Defendants, Gannett Co., Inc. and Wisconsin Newspaper Association, Inc.*

4719586_2

8