IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN INTERSCHOLASTIC
ATHLETIC ASSOCIATION and
AMERICAN-HIFI, INC.,

                              Plaintiffs,                        OPINION AND ORDER

     v.

                                                            09-cv-155-wmc

GANNETT CO., INC. and
WISCONSIN NEWSPAPER ASSOCIATION, INC.,

                              Defendants.

---

       This case turns on whether plaintiff Wisconsin Interscholastic Athletic Association violated the First or Fourteenth Amendment rights of defendants Gannett Co., Inc. and Wisconsin Newspaper Association, Inc. by selling to plaintiff American-Hi-Fi, Inc. an exclusive license to stream over the internet certain WIAA-sponsored tournament events. Before the court are the parties' cross-motions for summary judgment (dkt. ##31 and 39).[1] For the reasons stated, declaratory judgment will be entered for plaintiffs.

       Ultimately, this is a case about commerce, not the right to a free press.  The exclusive

---

[1]  The National Federation of State High School Associations and the Arizona Interscholastic Association, Inc. have also filed amicus briefs in support of plaintiffs' summary judgment motion (dkt. ## 95 and 111).  Plaintiffs also filed two motions to "strike" portions of affidavits filed by defendants (dkt. ##72 and 98), ignoring the repeated admonishments by the Seventh Circuit and this court that such motions are not the appropriate vehicle for challenging another party's summary judgment submissions. *See Wiesmueller v. Kosobucki*, 547 F.3d 740, 741 (7th Cir. 2008); *Redwood v. Dobson*, 476 F.3d 462, 470-71 (7th Cir. 2007); *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725 (7th Cir. 2006); *Stocker v. Kalahari Dev., LLC*, 2007 WL 1140246, * 1 (W.D. Wis. 2007).  The filing of these motions is particularly perplexing given that plaintiffs' response to defendants' proposed findings of fact objected to the disputed portions of the affidavits and defendants concede that "it would make little difference to the resolution of this case even if [plaintiffs'] motion was granted."  Defs.' Br., dkt, #107, at 4.   For all these reasons, the motions to strike are denied.

license American Hi-Fi purchased from WIAA does not violate the First or Fourteenth Amendment because it poses no threat to the rights and values embodied in those constitutional provisions.  The events sponsored by the WIAA are not public forums; the principal reason WIAA granted an exclusive license to stream its games over the internet is not to promote discourse, but to create and grow an additional source of revenue.  WIAA has made a business decision that it will be more lucrative to give one company the rights to broadcast its tournament games, a decision that does not stifle speech or discriminate on the basis of viewpoint.  Moreover, the public does not lose meaningful access to these games under the plaintiffs' agreement because other media companies are permitted to stream any tournament game American Hi-Fi declines to produce.  Even with respect to those games for which American Hi-Fi holds exclusive rights, defendants remain free to (1) publish stories on the games, (2) express opinions about them and (3) offer limited live coverage.  While WIAA has limited defendants' ability to use its tournament events to generate advertising dollars on other companies' websites, the Constitution does not require the government to assist private entities in making a profit.

UNDISPUTED FACTS[2]

## I.  The Parties

Plaintiff Wisconsin Interscholastic Athletic Association is a nonprofit organization

---

[2]  From the parties' proposed findings of fact and the record, the court finds that the following facts are undisputed.

2

that organizes, develops, directs and controls high school interscholastic athletic programs and sponsors tournament series. Its constitution includes the following threefold, purpose statement:

> A. To organize, develop, direct, and control an interscholastic athletic program which will promote the ideals of its membership and opportunities for member schools' participation.
>
> B. To emphasize interscholastic athletics as a partner with other school activities in the total educational process, and formulate and maintain policies which will cultivate high ideals of good citizenship and sportsmanship.
>
> C. To promote uniformity of standards in interscholastic athletic competition, and prevent exploitation by special interest groups of the school program and the individual's ability.

Members of WIAA include 506 public and private high schools and 117 junior high and middle schools. WIAA sponsors events for sports such as baseball, softball, basketball, football, golf, hockey, gymnastics, soccer and tennis, among many others. Plaintiff American Hi-Fi, Inc. does business as When We Were Young Productions, a video production company ("WWWY").[3]

Defendant Gannett Co., Inc. publishes newspapers across the United States, including 10 daily newspapers and 19 nondaily newspapers in Wisconsin. Defendant Wisconsin Newspaper Association, Inc. is a group of newspapers in Wisconsin that reports frequently on high school athletics, including tournaments sponsored by WIAA.

WIAA hosts and administers 25 State Championship Tournaments, which includes

---

[3] All parties here generally refer to plaintiff American Hi-Fi as WWWY, as will the court for the remainder of this opinion.

3

both boys' and girls' individual and team competitions.  WIAA leases the facilities or venues for most tournaments through long-term contracts of three to five years.  WIAA has use of the facilities or venues for the duration of the athletic competition as specified in the leases, but does not otherwise have any control over or obligation with respect to the management or operation of the facilities or venues when not used for WIAA athletic events.  Some of these venues do not have areas large enough to accommodate more than one camera crew for an event.  WIAA permits members of the public to attend a tournament upon payment of an admission fee.

## II.  WIAA's Contract with WWWY

Beginning in the 1980s, WIAA had an exclusive contract with Quincy Newspapers, Inc. to broadcast basketball tournaments and hockey finals.  In 2004, Quincy reduced its payment from $140,000 a year to $40,000 a year.  As a result, WIAA began to look for other sources of revenue.  WIAA asked its existing contractual partners whether they might be interested in broadcasting additional events, but all declined.

In early 2005, WWWY made a proposal to WIAA for the production and distribution of "broadcast quality" video of WIAA athletic events through all physical, electronic and broadcast media, including the internet.  At that time, no other media or production company had expressed interest in transmitting WIAA's games over the internet.

In May 2005, WIAA entered into a 10-year contract with WWWY called a "Production Rights and Distribution Agreement."  The agreement gives WWWY the

exclusive right to produce, sell and distribute all WIAA tournament series and championship events for all WIAA sports, except for football and hockey state finals, and the entire state boys and girls basketball tournaments, all of which were already covered by existing contracts.  This includes the exclusive rights to internet stream WIAA tournament events. WWWY in turn entered into a contract with Fox Sports Wisconsin under which all WIAA events are distributed for delayed television through Fox.

The Agreement identifies "production goals" of various events:  100% of state tournaments, 50% of sectional events and 25% of regional events.  The Agreement also provides for a multi-platform distribution strategy under which WWWY agrees to produce and distribute directly (or by contract with a distribution agent) WIAA events by live broadcasting, live or delayed streaming, video on demand, tape-delayed production and physical media.  Examples of distribution platforms include internet-based video on demand (webstreaming), DSL/Broadband based video on demand, cable-based video on demand, satellite based video on demand, cable (live or delayed), satellite (live or delayed), network (live or delayed) and other physical media.

The Agreement requires WWWY to make payments to the WIAA under the following formula:

i. [WWWY] will establish a tournament/event production cost that encompasses all business related expenses to produce the tournament or event.

ii. [WWWY] will receive 100% of all revenues generated by the distribution of the tournament/event up until all of the costs have been recaptured.

iii. All revenues generated after the tournament/event cost has been recaptured will be split 50% to the WIAA and 50% to [WWWY] with the exception of physical

5

media sales.

iv. All sales of physical media after the initial cost has been recaptured will be split 20% to the WIAA and 80% to [WWWY].

In 2008, WWWY paid WIAA $60,000 for these rights. In addition, WIAA received $80,000 from a "sponsorship partner," a portion of which came from advertising in programming produced by WWWY. WIAA keeps all of the revenue from the Agreement for its own internal operations; it does not transfer any of that revenue to the State of Wisconsin, to any state agency or to general state funds.

WIAA and WWWY created a web portal located at http://wiaa.tv/ and, in the Spring of 2007, WWWY started live streaming WIAA athletic events. The wiaa.tv web portal contains all live and archived videos produced by WWWY of all WIAA-recognized sports and other WIAA events, such as meetings for specific sports, rules meetings, press conferences and the annual meeting. WWWY operates and manages the wiaa.tv web portal for WIAA as part of its contractual responsibilities and at no cost to WIAA. WIAA has control over the content that is placed on wiaa.tv to ensure it supports and is consistent with the mission and purpose of WIAA, including what is displayed, when, and how.

In addition to placing WIAA tournament games on wiaa.tv, WWWY provides the following video production resources to the WIAA at no cost to WIAA:

- films, edits and makes available on wiaa.tv the WIAA's sports meetings, the WIAA's Annual Meeting and the annual scholar athlete award ceremony held in the spring in Wausau, Wisconsin;

- produces an annual video that compiles highlights of all state WIAA tournaments throughout the year, which WWWY films, edits, and makes available on wiaa.tv;

6

- films interviews of the presenters at the WASC Spirit of Excellence Award ceremony, which it includes in the final production of the award ceremony tape;
- provides live game feed to the video board at venues where the WIAA hosts championship tournaments;

- produces highlight segments from other WIAA sponsored sectionals or tournaments, does recaps with video from other WIAA state championship tournaments; and presents and feeds highlights to the video board at WIAA championship tournaments;

- films starting line-ups, introduction videos and/or team videos that it shows on the video board at all tournaments that have video board capability; and

- creates public service announcements that the WIAA and member schools can display on video boards at events and on wiaa.tv.

WWWY does not make any money directly from the streaming of WIAA events on wiaa.tv. The expenses that WWWY incurs to operate wiaa.tv are offset by WWWY's distribution contracts. WWWY has determined that it costs $508,806 annually to fulfill its contractual commitments to the WIAA, which include the following categories: state tournament event production costs in the field; state tournament event post-field production costs; channel production; state tournament venue production; web hosting and management; web live streaming; sports meeting production; and production of other meetings.

No WIAA events were offered on the internet in 2004-05. By 2008-09, the wiaa.tv web portal transmitted 82 live WIAA events and 175 on archived stream and DVD.

### III.  WIAA's Media Policies for State Competitions

7

WIAA publishes a "Media Policies Reference Guide," which is "produced to inform statewide media of WIAA policies in effect for all levels of State Tournament Series competition and assist members of the media in providing comprehensive coverage to their communities." (The policies do not apply to regular season games.) The 2009-2010 guide provides in relevant part:

### Requesting Credentials

* * *

7. The WIAA reserves the right and sole discretion to revoke current and deny future credentials to any media organization in violation of any WIAA media policies, failure to pay rights fees or any other provisions of credentials. Media organizations that violate credential policies are subject to legal liability, as well as all costs incurred in enforcing the terms of these policies, including but not limited to reasonable attorneys fees.

* * *

### Credential Provisions

1. The WIAA authorizes the number of credentials issued to any media organization. The WIAA media credential is issued to members of legitimate media outlets and/or Internet sites that have a professional working function (as determined by the WIAA) at WIAA State Tournament events. The credential provides access to specified locations, venues and events for which the credential was issued.

* * *

### Terms

* * *

3. **Live or real-time play-by-play** – A live or real-time play-by-play is defined as transmitting a live (while the event/game is in progress from beginning to conclusion) written, audio or visual description (identifying competitors with descriptions or

results of game action) of all or a significant number of plays/events occurring sequentially during a game/event.

* * *

## Regulations

### Comprehensive Policies

1.  The WIAA reserves the right to grant, issue, revoke and deny credentials to any media or Internet site organizations based on the interpretation and intent of these policies determined by the WIAA. In cases deemed unique by the Association, these policies may be amended. The WIAA and its exclusive rights partners retain the rights to all commercial use of video, audio, or textual play-by-play transmitted at a WIAA Tournament Series event. Furthermore, the WIAA owns the rights to transmit, upload, stream or display content live during WIAA events and reserves the right to grant exclusive and nonexclusive rights or not to grant those rights on an event-by-event basis.

2.  All "Real-time," or tape-delayed audio, video or textual transmission of play-by-play, is exclusive property of the WIAA and rights-granted entities.  Any account/transmitting of real-time video, audio or textual play-by-play is prohibited on-site or off-site without consent of the WIAA.

3.  The WIAA also reserves the right to revoke or deny the video, audio or text transmission rights of any media or Internet sites that include in any part of its transmission of WIAA Tournament events, including pre-game and post-game shows, content or comments considered inappropriate or incompatible with the educational integrity of the tournament or host institution from which the transmission is originated.

* * *

### Video

* * *

3.  The use of video exceeding **two** minutes by the originating station, publication or Internet site—other than the exclusive video production rights holder—for any purpose other than highlights on regularly scheduled news or sports broadcasts, or on a Web page is prohibited.

9

4.

    A. . . . Stations or Web sites may use a backdrop of live action for reports from a tournament facility provided there is no play-by-play commentary and the report is limited to regularly scheduled news or sports programs and are no more than **two** minutes of a program which is any length.

\* \* \*

6. Video of Tournament Series action may not be sold without written consent from the WIAA and its respective licensed video production partner.

\* \* \*

**Text**

\* \* \*

2. Internet blogs, forums or twitters not posting continuous play-by-play accounts of game or event action are permitted and are not subject to rights fees unless determined by WIAA to be a live, play-by-play depiction of event action . . ., are not in compliance with the mission and media policies of the WIAA or are associated with any promotion, reference or link material surrounding the content is deemed inappropriate or not in the best interest of the WIAA. Real-time play-by-play accounts of WIAA Tournament Series events are subject to text transmission rights fees.

\* \* \*

**Video Transmissions**

\* \* \*

Production and distribution rights include, and are not limited to, live or delayed television through network or cable outlets, video on demand, content streaming through any platform and/or physical media. All permission granted, policies enforced and fees required will be at the sole discretion of the WIAA and the rights holder. Detailed information regarding polices and fees are available upon request from When We Were Young Productions (608) 849-3200.

\* \* \*

**Applying for Regional & Sectional Transmission Rights**

**Video**

1.   All media and/or Internet parties interested in video transmission of WIAA Tournament Series events must make arrangements with When We Were Young Productions (608) 849-3200 to inquire about video transmission or Internet transmission permission prior to the date of the contest. Entities not adhering to permission policies are subject to fines imposed by the rights holder. Live or tape-delayed video transmission rights of regional and sectional events by television stations, cable operators and Internet sites is prohibited without consent of the WIAA and When We Were Young Productions.

* * *

**Advertising**

. . . The WIAA strictly prohibits the sponsorship and advertising of tobacco products, lottery/gambling, alcoholic beverages, mood-altering substances, or lewd subject matter.

Under these policies, if WWWY chooses not to produce an event, others may pay WWWY to do so.  WWWY has never rejected a request to produce an event for another entity.  Under the current fee structure, it costs $250  to stream an event over the internet with one camera; if multiple cameras are used, the cost is $1250 or $1500.[4]

WIAA and WWWY considered several factors in determining these prices:

First, it was consistent with or lower than the fees charged by other state athletic associations. Second, we looked at the value of the production and the resources devoted to the production: a one-camera production with no announcer is much different then a multi-camera production, which usually involves a mobile television broadcast truck and announcer, and requires more resources at the venue itself (there is a cost to the host venue to have to accommodate the extra individuals and to provide power for the production

---

[4]  In his first affidavit, dkt. #54, Todd Clark, WIAA's Director of Communications, testified that the rate for multiple cameras was $1250.  In his second affidavit, dkt. #83, he testified that $1250 was "inaccurate" and that $1500 was the correct amount.  The difference is immaterial.

11

truck which is much different than for an individual cameraperson). We also considered the medium, whether internet or TV, and how wide the distribution would be, whether local or world-wide. We determined that the multi-camera production lends itself to a wide internet distribution platform that people are able to see world-wide, whereas a single camera local PEG station production is shown only through the television medium for distribution to the local community.

Eichorst Aff. ¶39, dkt. #55. Neither WIAA nor WYYY have a written policy limiting the fee to a particular amount.

WIAA charges $20 for permission to transmit "play-by-play" text in a regional or section game; it charges $30 for a state game. "Blogging on the Internet not transmitting a play-by-play description (as determined by the WIAA) is not subject to rights fees." Media companies may carry live audio streams of tournament games by paying WIAA an additional rights fee of $40-$50. WIAA policy permits the taking of photographs for reporting purposes, post-game interviews of players and coaches, radio and other broadcasts of WIAA events. WIAA has not denied a legitimate media organization entry to a tournament, entry to designated media facilities of WIAA-sponsored events or media credentials.

## IV.  WIAA's Budget

Most of WIAA's annual revenue is generated by the State Tournament Series, which WIAA organizes, sponsors, and administers. In 2007-2008, the tournaments brought in $6,202,963, which was 86% of the WIAA's total operating revenue of $7,177,115. The remaining 2007-2008 WIAA revenue came from membership dues, which amounted to .5% of revenue; sports fees, which amounted to 5.5% of revenue; officials dues, which amounted

to 5% of revenue; and miscellaneous revenue such as subscriptions and rule book orders, which amounted to 3% of revenue. All of WIAA's revenue is used to support its programs, including paying for the expenses of operating the tournaments in all WIAA recognized sports. The WIAA's tournament revenues come primarily from ticket sales.

Some of the WIAA recognized sports generate a profit, and others generate a loss for the WIAA. WIAA uses the money made in more profitable programs to support less profitable ones.

During the 2008-09 academic year, there were at least 3,585 WIAA-sponsored tournament events covered by the WWWY contract. Of these events, 134 were produced by WWWY or its affiliates under the WWWY contract with WIAA.

## V. Games Streamed without Plaintiffs' Consent

The Post-Crescent, a newspaper published in Appleton, Wisconsin by the Gannett chain transmitted the following WIAA-sponsored tournament games through live internet streaming, without the consent of WIAA or WYYY:

- October 28, 2008, Green Bay Preble High School v. Appleton North High School, at Appleton North High School;

- October 28, 2008, New London High School v. Waupaca High School, at Waupaca High School;

- November 1, 2008, Appleton North High School v. Bay Port High School, at Bay Port High School; and

- November 8, 2008, Appleton North High School v. Stevens Point Area High

School, at Stevens Point Area High School.

In November 2008, WWWY contacted defendant Gannett and requested that it remove the unauthorized games from its website, pay the associated rights fee and provide WWWY with the DVD of the game. Gannett refused.

OPINION

**I. Scope of the Lawsuit**

Determining which claims are still properly before the court is not the obvious exercise it should be. The parties do not clearly delineate their claims in the briefs and some of the arguments seem to evolve from one brief to the next.

In their amended complaint, plaintiffs seek a declaratory judgment that they have the right to control the live streaming and play-by-play of WIAA-sponsored tournament games over the internet, to grant licenses for such transmission and to require payment for receiving a license. Pls.' Am. Compl., dkt. #7, ¶ 36. In their answer and counterclaim, defendants challenge that right, as well as three aspects of the WIAA's media policies: (1) restrictions on taking photographs at tournament games and an exclusive contract WIAA has with Visual Image Photography regarding sales of photographs taken at those games (Defs.' Answer and Countercl., dkt. #2, ¶¶ 25-32); (2) restrictions on streaming tournament games over the internet and an exclusive contract WIAA has with WWWY regarding internet streaming (*id.* at ¶¶ 33-43); and (3) restrictions on "blogging" about tournament games while

14

they are happening (*id.* at ¶¶44-48).[5]

The parties' submissions in support of cross-motions for summary judgment do not track these pleadings. The sole issue plaintiffs' address in their motion for summary judgment is whether the limitations on internet streaming violate the First and Fourteenth Amendments to the United States Constitution. Plaintiffs raise no arguments regarding their rights under any other federal or state laws. To the extent plaintiffs ever intended to assert claims beyond those arising under the First or Fourteenth Amendment, they have abandoned those claims.

In defendants' motion for summary judgment, they drop their challenge to one policy and add another. In particular, defendants say nothing in their briefs about the photography policy. In light of this silence and the parties' stipulation to drop Visual Image Photography as a party *(*dkt. #6), defendants have effectively abandoned their challenge to that policy. Defendants' new claim on summary judgment is that plaintiffs are violating the First Amendment by retaining the right to revoke a media company's credentials for making "inappropriate" comments. Defs.' Br., dkt. #32, at 13. Defendants now assert that this "policy" is vague, gives plaintiffs too much discretion and discriminates on the basis of content.

A party may not raise a claim at summary judgment if it did not provide notice of the claim in the pleadings as required by Fed. R. Civ. P. 8. *Grayson v. O'Neill*, 308 F.3d 808, 817

---

[5] Defendants filed an amended answer to plaintiffs' amended complaint, but did not amend their counterclaims. *See* dkt. #13.

(7th Cir. 2002) (plaintiff "'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment'") (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996)).  *See also EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir.  2008) ("The very first mention of [the new claim] came in the EEOC's response to Log Cabin's motion for summary judgment, and the [district] court was entitled to regard this as 'too late' to change so basic a factual premise in the case.")  Defendants do not deny failing to provide any advance notice of their challenge to WIAA's standards for revoking media credentials, but argue that plaintiffs' complaint seeks a "broad declaration" of the constitutionality of WIAA's media policies, making it fair game for defendants to challenge any aspect of those policies.  Defs.' Reply Br., dkt. #107, at 3.

While plaintiffs' amended complaint includes general references to "Media Policies," the only policies they identify as part of their claim are those relating specifically to internet streaming.  Plaintiffs did not ask for a declaration or any other relief related to the standards for awarding or revoking media credentials.  Even if plaintiffs had raised that issue in their original complaint, defendants are not necessarily entitled to judgment on a claim plaintiffs initially asserted but abandoned on summary judgment.  A party's own pleading frames the affirmative relief it may seek in a case.  If plaintiffs had included a claim about revoking credentials in their complaint and asserted it at summary judgment, defendants could have raised the First Amendment as a defense, but they cite no authority for the proposition that a defendant may seek affirmative, declaratory relief on matters omitted from its own pleading.  Perhaps most important, the parties' summary judgment materials do not develop

16

sufficient facts, nor adequately join issue, on the actual standards used in revoking media credentials, either as a general proposition or as applied. Given the complexity of the claims properly developed by the parties with regard to the unauthorized streaming of games, this court declines to take up an undeveloped challenge to the WIAA's "Media Policies."

Similarly, defendants appear to raise a half-hearted challenge to plaintiffs' definition of "live or real time play-by-play" in WIAA's Media Policies on the ground that it is unconstitutionally vague. Defendants have, however, forfeited that claim by failing to develop a meaningful argument in support of it. *See Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 609 (7th Cir. 2008) ("Nor does Fabriko present any caselaw supporting its theory. It is not the job of this court to develop arguments for appellants."); *Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1006 (7th Cir. 2008) (concluding that two-paragraph "cursory argument" was "so brief that [plaintiff] ha[d] waived it"); *Pruitt v. City of Chicago, Ill.*, 472 F.3d 925, 930 (7th Cir. 2006) ("[I]nsufficient development forfeits all of these arguments. Appellate counsel must recognize that scattergun contentions are doomed to failure."). Defendants devote a single paragraph to that argument in their opening brief, dkt. #32, at 15, and another in their reply brief, dkt. #107, at 7-8. The argument in both briefs is undeveloped, conclusory and includes no citation to authority beyond the general standard for vagueness. If a party wishes to challenge the constitutionality of a state policy, it must do more than say generally that "[t]he regulation [is] unconstitutionally vague." Dkt. #32, at 15.

Finally, the parties briefed the potential preemptive impact of the Copyright Act, 17

17

U.S.C. §§ 101, *et seq.*, on plaintiffs' since abandoned request for a declaration of its right to require Gannet to remove from its website video of four WIAA-sponsored tournament games, previously recorded and streamed live over the internet by Gannet without WIAA's permission.  Defendants still seek a declaration of the Gannet's copyrights to these videos in its third counterclaim.  In their response, however, plaintiffs argue in part that having dropped its affirmative claim to these videos, there is no present case or controversy with respect to ownership.  Moreover, the parties' responsive briefs on the copyright issues devolve mainly into criticism of the other side's claim, misstatements of the issues, and misunderstandings of the other's arguments.

In the end, plaintiffs appear to acknowledge defendants right to copyright in its own work, but not its right to stream live events without the WIAA's authorization and payment of a fee; for their part, defendants concede that its claimed copyrights to its own work does not preempt WIAA's otherwise valid exclusive media rights.   Thus, the only remaining question on this claim appears to be whether defendants acquired a copyright with respect to broadcasts of WIAA events that it filmed without the consent of WIAA or WYYY.

Stripped of claims not raised or sufficiently developed, therefore, the parties' summary judgment submissions present the following issues:

(1) whether WIAA's exclusive contract with WYYY regarding internet streaming of tournament games violates the First or Fourteenth Amendments;

(2) whether the fee charged to defendants to stream games that WYYY declines to produce violates the First Amendment;

(3) whether plaintiffs retain too much discretion to refuse licenses to media companies who wish to stream games WYYY declines to produce;

18

(4) whether defendants have a copyright with respect to the games they streamed without plaintiffs' permission.

These four claims are addressed below.[6]

## II. Exclusive License

### A. First Amendment

Defendants argue that WIAA violated their First Amendment rights by giving WYYY an exclusive license to stream certain tournament games, but have an uphill battle on many fronts. To begin with, a well-crafted argument is no substitute for supporting case law. It is telling of the merits' of defendants' claim that they have failed to uncover a single case in which a court concluded that a public entity violated the First Amendment under circumstances bearing any resemblance to this case. Defendants instead resort to citing a number of Supreme Court cases for general principles that shed little light on the question before this court. Moreover, in many of those cases, the Court found no constitutional violation. In fairness though, neither side -- or either of the *amici* -- has identified a case that has addressed the constitutionality of an exclusive contract for internet streaming between a public sponsor of a sporting event and a private company. A review of the most closely analogous cases, however, confirms that the First Amendment does not prohibit WIAA from generating revenue to support its sports programs by entering into an exclusive contract over the right to stream the games it sponsors over the internet. Defendants argument to the

---

[6] Because the parties have stipulated that WIAA is a "state actor" for purposes of the First and Fourteenth Amendment, that issue will not be addressed.

contrary depends upon a series of tenuous premises: (1) WIAA has created a "designated public forum . . . for media coverage of tournament events"; Defs.' Br., dkt. #32, at 24; (2) the designated public forum extends to internet streaming; (3) any restrictions on access to that forum are subject to strict scrutiny; and (4) plaintiffs do not have a narrowly tailored compelling interest justifying the exclusion of defendants from the forum. None carry the day.

## 1. Public versus nonpublic forum

In a recent Seventh Circuit decision, Judge Posner summarized the Supreme Court's increasingly nuanced, if not always helpful, list of public and non-public fora as follows:

> The Supreme Court distinguishes a "traditional public forum" from a "designated public forum" and both from a "nonpublic forum."
>
> A traditional public forum is a street or park, or some other type of public property that like a street or park has long ("time out of mind," as some cases put it, or "from time immemorial," as others say) been used for expressive activity, such as marches and leafletting.
>
> A designated public forum, illustrated by a public theater, is a facility that the government has created to be, or has subsequently opened for use as, a site for expressive activity by private persons. Usually, as in the case of a public theater, it is available only for specified forms of private expressive activity: plays, in the case of a theater, rather than political speeches. . . .
>
> The third category–the "nonpublic forum"–consists of government-owned facilities like the Justice Department's auditorium that could be and sometimes are used for private expressive activities but are not primarily intended for such use. The government can limit private expression in such a facility to expression that furthers the purpose for which the facility was created.
>
> Some decisions recognize a fourth category, a variant of the second, variously called a "limited designated public forum" (what Shakespeare's Polonius would

> have called "a vile phrase"), a "limited public forum," or a "limited forum."
> The terms denote a public facility limited to the discussion of certain subjects
> or reserved for some types or classes of speaker.

*Illinois Dunesland Pres. Soc'y v. Illinois Dep't of Natural Res.*, 584 F.3d 719, 723 (7th Cir. 2009)

(citations omitted).

If a forum is "public" or "designated public," "the rights of the State to limit expressive activity are sharply circumscribed"; the state may only enact content-neutral "time, place, and manner" restrictions or content-based rules that are "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). In a nonpublic forum, the government may "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46.

### a. regulatory versus proprietary capacity

In arguing that WIAA has designated the venues for its sporting events as public fora, defendants point out that the events "are open generally to the public and the news media." Defs.' Br., dkt. #32, at 24. But the government does not create a public forum simply by allowing the public in. *United States v. Kokinda*, 497 U.S. 720, 729 (1990) ("Postal entryways . . . may be open to the public, but that fact alone does not establish that such areas must be treated as traditional public fora under the First Amendment."); *Greer v. Spock*, 424 U.S. 828, 836 (1976) (rejecting argument that "whenever members of the public are

permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment."). *See also United States v. Hastings* 695 F.2d 1278, 1280 (11th Cir. 1983) (press has a right of access to observe criminal trials, but that right does not extend to "right to televise, record, and broadcast trials"). Rather, heightened scrutiny is appropriate for a particular forum when its "purpose . . . is the free exchange of ideas." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

WIAA invites the public to its members' games not for the purpose of fostering debate, but in substantial part to make money. Both the general public and the media must <u>pay</u> for a ticket to gain admission to an event. The media pays extra if it wishes to have text or audio transmissions during the game. This is not simply a matter of making a profit; those funds are needed to help sustain the WIAA and the high school sports it supports. WIAA is a self-sustaining organization, using the revenue it generates from ticket sales and other sources, including its exclusive contract with WYYY, to pay the expenses of its various sports programs. Thus, WIAA is always looking for additional sources of revenue to maintain the quality of those programs.

When the government acts in a commercial or proprietary capacity, as WIAA does with respect to the tournament games it sponsors, it weighs strongly against finding that the government has created a public forum or that regulation of speech within that forum is subject to strict scrutiny. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("Where the government is acting as a proprietor, managing its internal

22

operations, rather than acting as lawmaker with the power to regulate or license, its action

will not be subjected to the heightened review to which its actions as a lawmaker may be

subject."); *Kokinda*, 497 U.S. at 725-26 (plurality) (in finding that sidewalk in front of Post

Office not public forum, the Court emphasized that ("[t]he Government [is] acting in its

proprietary capacity"); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (plurality)

(city did not create public forum by allowing some advertising in public transit system;

"[T]he city is engaged in commerce. . . . The [advertising] space, although incidental to the

provision of public transportation, is a part of the commercial venture."); *Ridley v.

Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 79 (1st Cir. 2004) ("[A] lower level of scrutiny

usually applies when the government acts as proprietor.").[7]

A lower level of scrutiny is often appropriate in this context because the risk that a

speech limitation "will impermissibly interfere with the marketplace of ideas" is more

"attenuated" when the government is not acting as a regulator. *Davenport v. Washington Educ.*

---

[7] *See also Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 797 F.2d 552, 555 (8th Cir. 1986) ("[The Metrodome] is a commercial venture by the city constructed to meet the need for a major sports facility in the Twin Cities area and, at the same time, to provide economic benefits to the area. It follows that the Metrodome does not come within the scope of a traditional public forum."); *KTSP-TAFT Television & Radio Co. v. Arizona State Lottery Comm'n*, 646 F. Supp. 300, 309 (D. Ariz.1986) ("Where commercial activity is the state action at issue, conscious limitations on access are permissible where the limitations are consistent with the activity and are not arbitrary in their implementation."); *Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 85 (D. Conn. 1981) ("The degree of scrutiny focused upon the contract provisions depends upon the capacity in which the city is functioning as it operates the Civic Center."); *HippoPress, LLC v. SMG (A Pennsylvania Partnership)*, 837 A.2d 347, 357 (N.H. 2003) (in dicta, concluding that city arena was not public forum  because defendant "did not open the arena for public discourse" but "to provide the downtown area with economic stimulus").

*Ass'n*, 551 U.S. 177, 188 (2007). Further, imposing heightened scrutiny on the government's proprietary activities may place undue burdens on the government in its attempt to compete with private entities. *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) ("[c]ourts hesitate to impose in the name of the Constitution extravagant burdens on public [entities] that private [entities] do not bear.")

Defendants argue that the WIAA's sponsorship of tournament events is not properly classified as a proprietary activity because WIAA events are "educational, not commercial, activities." Defs.' Br., dkt. #76, at 14. As proof, defendants cite WIAA's mission statement, which states that its purposes are to further noncommercial goals such as "promot[ing] the ideals of its membership," "emphasiz[ing] interscholastic athletics . . . in the total education process" and "promot[ing] uniformity of standards in interscholastic athletic competition." In addition, defendants point out that WIAA receives a sales tax exemption for its ticket sales under Wis. Admin. Code § Tax 11.03(2)(a)5.

Defendants cite no authority for their view that an entity with broader purposes and tax exempt status can only operate in a public forum for First Amendment purposes. The question is whether the entity is participating in the marketplace to sustain itself, not whether the state decides to give the entity a tax break to make the task a little easier. *See Lee*, 505 U.S. at 682 ("[a]irports [are proprietary operations because they] are commercial establishments funded by users fees and designed to make a regulated profit"); *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 775 (2d Cir. 1984) (concluding that "the management of station facilities is a proprietary, not a governmental

24

function" because "[p]roviding commuter service is economically burdensome and the New York legislature established MTA as a self-sustaining entity").  Further, as plaintiffs point out, an entity may act in a proprietary capacity even if it has purposes other than generating revenue.  Hence, public airports serve many important functions unrelated to generating revenue, but the Court concluded in *Lee* that they were commercial establishments nonetheless.  505 U.S. at 682-83.

Defendants correctly observe that the forum analysis does not necessarily come to an end if a court determines that the public entity is acting in a proprietary capacity.  *Air Line Pilots Ass'n, Intern. v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1158 (7th Cir. 1995) ("The fact that the government acts as a proprietor does not negate the need to engage in public forum inquiry.").  Defendants fail, however, to cite any cases in which a court determined that the government created a public forum when principally acting as a proprietor.[8]

**b.  government's intent and nature of the forum**

---

[8]  The First Circuit has observed that "[p]ublic forum analysis itself has been criticized as unhelpful in many contexts, and particularly this one where the government is operating a commercial enterprise." *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 75-76 (1st Cir. 2004) (citing Laurence H. Tribe, *American Constitutional Law* § 12-24, at 992 (2d ed. 1988), *and* Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 97 (1998)).  *See also Illinois Dunesland Preservation Soc'y v. Illinois Dept. of Natural Res.*, 584 F.3d 719, 723 (7th Cir. 2009) ("[I]t is rather difficult to see what work 'forum analysis' in general does.") This court nevertheless applies a forum analysis because that is the predominant test applied by the Supreme Court and the Seventh Circuit, as well as the test used by the parties in their briefs.

The reason courts rarely find that the government has created a public forum in a commercial context may be related to the importance of the government's intent in the analysis. The government cannot create a public forum "by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802.  While this seems to make First Amendment rights contingent on the whim of the government, the Supreme Court has explained that, "[b]y recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998).

When the government is conducting business, its intent is more likely directed toward creating a forum that will maximize its revenue rather than maximize public discourse. *Lee,* 505 U.S. at 682 ("As commercial enterprises, airports must provide services attractive to the marketplace. In light of this, it cannot fairly be said that an airport terminal has as a principal purpose promoting 'the free exchange of ideas.'"). In the context of a contractual relationship, it may not only make bad business sense to offer everyone the same deal, but logistical limitations could make it impossible to do so.

Also relevant is the nature of the speech at issue.  Some events, such as political events, by their very nature foster free discourse regardless of the intent of the event's sponsor. *See American Broad. Companies, Inc. v. Cuomo*,  570 F.2d 1080, 1083 (2d Cir. 1978) (post election activities of governor in which some members of media were invited).  On the other hand, a typical sporting event -- even one played for a state championship -- has little

26

expressive content for purposes of the First Amendment, save for entertainment and, perhaps, inspiration. *Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co.*, 510 F. Supp. 81, 86 (D. Conn. 1981) (in the case of figure skating championships, "the exposition of an athletic exercise. . . . is on the periphery of protected speech"). While [i]t is . . . true that entertainment itself can be important news," *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977), the same First Amendment scrutiny to limitations on access to a political event do not necessarily apply to limitations on a sports tournament.

Defendants' argument appears to be that once the WIAA makes the decision to let the media in, it must let members of the media do anything that is part of their own view of the "journalistic function," Defs.' Br., dkt. #76, at 21, unless the government can justify the restriction with a narrowly-tailored, compelling state interest. But a forum is defined not just by the physical setting where the speech takes place, but by "the access sought by the speaker." *Cornelius*, 473 U.S. at 801. Defendants are not seeking access to the sporting events generally; it is undisputed that they already have that access. Rather, defendants are seeking much broader access so that they may stream the games over the internet at no charge for their own commercial purposes.

In this respect, this case is similar to that considered by the Supreme Court in *Cornelius,* where the question was whether the federal government violated the NAACP Legal Defense and Educational Funds' First Amendment rights as an advocacy group by excluding it from a charitable program run by federal employees. The Court concluded that the relevant forum was not the "federal workplace," but the charitable program itself because the

27

plaintiffs were "seek[ing] access to a particular means of communication." *Id.* at 801.  *See also Hubbard Broad., Inc. v. Metro. Sports Facilities Comm'n*, 797 F.2d 552, 555 (8th Cir. 1986) (when plaintiff's claim was that city violated First Amendment by refusing its advertising in Metrodome, "the crucial question is not whether the Metrodome, as a whole, is a public forum but whether the Commission designated advertising space within the Metrodome a public forum").  Here, too, defendants are seeking unfettered access to "a particular means of communication" -- transmitting the game over the internet.

There is no genuine dispute that WIAA never intended to open up its events for internet streaming by the general public or the media.  Before 2005, *no one* streamed WIAA games and it does not appear that there was any interest in doing so.  *Air Line Pilots*, 45 F.3d at 1152 (in determining government's intent, "we must look to the policy and practice of the government with respect to the underlying property").  Defendants ask the court to infer an intent by WIAA to "open the venues to internet streaming" because it granted WYYY such access.  Defs.' Br. dkt. #76, at 21.  Allowing one company access to a newly-created forum need hardly be construed as the government's intent to make the forum public.  Rather, in cases in which courts have concluded that the government intended to create a public forum, it is because the government provided access to a large group of speakers and then attempted to exclude one speaker within the group.  *See*, *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1102-03 (C.D. Cal. 2003) (citing cases).

Granting access to one individual or even several individuals or groups, is not sufficient to show that the government intended to designate a public forum. *Arkansas*, 523

U.S. at 670  ("To create a [public] forum . . ., the government must intend to make the property 'generally available.'. . . A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers."); *Hubbard*, 797 F.2d at 556 ("When, as here, the city, acting in a proprietary capacity, has allowed a small number of commercial advertisers access to a limited amount of advertising space on government property in order to generate revenue, the city has not created a public forum.")

Perhaps even more important, WIAA could not have intended to create unlimited media access for streaming tournament games because it would be impossible to do so. Defendants acknowledge that streaming a game over the internet requires space for the camera and a crew. Obviously, the venues for WIAA events have limited space particularly for those sight lines most conducive to viewing all the actions.  The record shows some venues would not be able to accommodate more than one broadcaster, and no venue would accommodate everyone who wishes to set up cameras for streaming.  Defendants fail to explain how WIAA could have intended to create a public forum under those circumstances. *Air Line Pilots*, 45 F.3d at 1152  (in determining government's intent, "we must examine the nature of the property and its compatibility with expressive activity").  *Cf. Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) (scarcity of radio frequencies is adequate justification for regulation of radio broadcasting).

Just as there is a long history of licensing exclusive radio and television broadcasts by public, quasi-public and private entities, so too must internet streaming allow for such rights.

29

## 2. Review for reasonableness

Because WIAA did not create a public forum for streaming its games over the internet, the exclusive license is reviewed for reasonableness. *Cornelius*, 473 U.S. at 809. Under this standard, the government's reason for the restriction need not be compelling; a restriction may survive even if other reasonable alternatives are available; and the government is free to restrict access on the basis of "subject matter *and speaker identity,*" so long as the restriction is consistent with the purpose of the forum and does not discriminate on the basis of viewpoint. *Id.* at 806-09 (emphasis added).

There can be little doubt that plaintiffs' exclusive license passes constitutional muster under this standard. In the cases cited by the parties involving First Amendment challenges to exclusive licenses, no court found a constitutional violation. *See Jacobsen v. City of Rapid City, S.D.*, 128 F.3d 660, 663-65 (8th Cir. 1997) (small airport did not violate First Amendment by giving gift shop exclusive right to sell newspapers on premises); *Hubbard Broad.*, 797 F.2d at 554-57 (government did not violate First Amendment by selling 10-year exclusive advertising contracts for public arena); *KTSP-TAFT Television & Radio*, 646 F. Supp. at 311-13 (state did not violate First Amendment by giving exclusive contract to one television station to broadcast lottery); *Post Newsweek Stations-Connecticut*, 510 F. Supp. at 86 (city did not violate First Amendment by allowing only one media company to broadcast ice skating championships held at civic center); *HippoPress*, 837 A.2d at 356-58 (in dicta, assuming that management company for city arena was a "state actor," it did not violate

30

First Amendment by contracting with one company for exclusive newspaper distribution rights in arena).

Defendants put forth a heroic effort in arguing that each of these cases is distinguishable, and are correct to the extent that none of them involved a high school athletic association granting an exclusive license for certain types of media, but that is not a salient difference. Like the entities in *Jacobsen*, *Hubbard, KTSP, Post Newsweek* and *HippoPress*, WIAA has entered into an exclusive contract with one company for the primary purpose of generating revenue to support itself and incidentally limited the speech activities of another company in the process.

### a. WIAA's interests

Other federal circuits have recognized that generating revenue is a reasonable interest when the government is acting in its proprietary capacity and that a contract is significantly more valuable when it is exclusive. *See, e.g., Jacobsen*, 128 F.3d at 663-64 ("If the City must allow Jacobsen and other vendors to sell First Amendment protected materials in newsracks outside the gift shop, the concessionaire will lose revenues, making its exclusive contract less valuable. That in turn will reduce the City's leverage in bargaining for terms such as minimum annual concession fees and pro rata utility charges."); *Hubbard,* 797 F.2d at 556 (deferring to government's assertion "that the most effective way to raise revenue from advertising on the scoreboard within the Metrodome was to sell exclusive ten-year contracts in designated product categories"); *Gannett Satellite Info. Network,* 745 F.2d at 775 ("When

a government agency is engaged in a commercial enterprise, the raising of revenue is a significant interest.").[9]

None of these cases establish binding authority and neither side cites any cases on point from the Supreme Court or the Seventh Circuit. Nevertheless, the courts' reasoning in these cases is persuasive and the uniformity in their holdings cannot be ignored. Further, the Seventh Circuit has recognized that the government has a legitimate interest in "limiting competition with the city's own money-making activities, such as the granting of exclusive licenses to vend in exchange for a percentage of the vendor's revenues or some other form of fee," even when it limits activities protected by the First Amendment. *Ayres v. City of Chicago*, 125 F.3d 1010, 1015 (7th Cir. 1997). The Supreme Court, too, has recognized that it is legitimate for the government to restrict access to a forum when it is acting in a proprietary capacity and expanding access could jeopardize its ability to earn revenue. *Lehman*, 418 U.S. at 303-04.

Defendants attempt to diminish the importance of WIAA's interest in raising revenue by pointing out that the money it receives from the exclusive license is only a small part of

---

[9] *See also KTSP-TAFT Television & Radio*, 646 F. Supp. at 311-12 ("[U]nrestricted and uncompensated broadcasts of the Pick drawing would affect adversely the economic posture of the Lottery. If all Lottery publicity must be purchased, then maximum net revenue from the Lottery will be reduced."); *Post Newsweek Stations-Connecticut*, 510 F. Supp. at 86 ("Any approach other than upholding this limited restriction could jeopardize the revenue derived from future entertainment contracts."); *HippoPress*, 837 A.2d at 358 ("The contract between SMG and Union Leader is reasonable because it is wholly consistent with SMG's interest in operating a financially viable commercial arena. Without the ability to enter into exclusive contracts for advertising and distributing products, SMG would be severely hampered in its ability to compete in the marketplace.").

its budget.  That may be so, but defendants cite no authority for the proposition that an interest is not legitimate unless the government can show that it would not survive without the regulation. Defendants do not challenge plaintiffs' claim that an exclusive contract is more lucrative than one that would allow all media companies an equal chance to stream each game.  That proposition is patently obvious and sufficient under a reasonableness standard.

Alternatively, defendants argue that WIAA could raise the same amount of revenue by raising ticket prices on the general public.  This may be defendants' boldest argument, as well as the least sympathetic one. In a nonpublic forum, the government does not have to rule out other alternatives before limiting speech in order to further a legitimate interest. *Cornelius*, 473 U.S. at 809.  It was reasonable for WIAA to grant an exclusive license to WYYY so that it could keep ticket prices more affordable, rather than require the public to pay more so that other media companies could use the tournaments to generate advertising revenue on their own websites.

Finally, defendants argue that an interest in raising revenue "is never sufficient, by itself, to justify restrictions on the press." Defs.' Br., dkt. #76, at 25.  The Supreme Court case they cite for this proposition, however, relates to a *tax* placed on a narrow subset of the press in the government's capacity as a regulator. *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231-32 (1987).  The rationale for the rule was "the censorial threat implicit in a tax that singles out the press." *Id.* at 232 (quoting *Minneapolis Star* & *Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 586 (1983)).  For this reason alone, *Arkansas*

33

*Writers' Project* is hardly instructive in a context where the government has granted an exclusive license in its capacity as a proprietor.

In any event, plaintiffs also rely on interests other than raising revenue. For example, WIAA asserts a reasonable interest in trying to ensure that more of its games make it onto the internet. *Cf. KTSP-TAFT Television & Radio Co.*, 646 F. Supp. at 310 ("In the case at bar the significant governmental interest is the opportunity of the public to see the drawing live every week."). While defendants argue that the exclusive license undermines that goal by limiting the number of companies that can carry the game, this view is unnecessarily myopic. The right defendants seek is to stream or not stream any game they wish after making their own determination about the game's newsworthiness and, no doubt, the directly proportional advertising revenues it will generate.

Under WYYY's agreement with WIAA, the goal is for WYYY to produce 100% of state tournaments, 50% of sectional events and 25% of regional events. While these are not mandatory percentages, defendants do not suggest that they are able, much less willing to produce the same number of games that WYYY does. On the contrary, it is reasonable to assume that defendants and other news outlets will seek to "cream skim" the most popular games, leaving the WIAA and WYYY with less profits to apply toward covering less popular games. Thus, while particular games may be not be as widely available as a result of the exclusive license, WIAA could reasonably believe that, overall, the license would increase the exposure of its games overall.

Even for those games not covered by the license, defendants have not shown that

permitting additional carriers would significantly increase the viewing audience.  Anyone

with access to defendants' websites would also have access to WIAA's website.  Thus, those

interested in the game can view it online, regardless of whether defendants are allowed to

carry it or not.


### b.  reasonableness in light of purpose of the forum

Defendants argue that their exclusion from the forum "is not reasonable because

allowing others to [stream games over the internet] is not incompatible with the forum's

purpose."  Defs.' Br., dkt. #32, at 26.   This is incorrect for at least two reasons.  First,

plaintiffs do not have to show that allowing access would be  "incompatible" with the forum,

only that the restriction is one reasonable way to serve the forum's purposes. *Cornelius,* 473

U.S. at 808 ("In contrast to a public forum, a finding of strict incompatibility between the

nature of the speech or the identity of the speaker and the functioning of the nonpublic

forum is not mandated.").  Second, defendants' argument assumes without record support

that a major, if not exclusive, purpose of the forum is to allow the media unlimited access

to film WIAA games, when the record shows that the forum's primary purpose is to create

another source of revenue for WIAA.  Allowing defendants access *is* inconsistent with that

purpose, because it would take away a guaranteed source of revenue for plaintiffs.

Defendants also cite *Perry* for the proposition that, "[w]hen speakers and subjects are

similarly situated, the state may not pick and choose."  460 U.S. at 55.  Defendants argue

they are "similarly situated" to WWWY because both defendants and WWWY are vying for the same right to stream the games, but the question is not simply whether two speakers wish to use a forum for the same purpose. "[G]overnment may draw permissible status-based distinctions among different classes of speakers in order to preserve the purpose of the forum, even when the proposed uses by those inside the permitted class of speakers and those outside the permitted class of speakers are quite similar." *Gilles*, 477 F.3d at 470 (quoting *Goulart v. Meadows*, 345 F.3d 239, 254 (4th Cir. 2003)). In fact, the government may exclude a speaker from a forum even if it is "wonderfully suited" for the speaker's asserted purpose. *Id.* The question is whether the government has a reasonable basis for concluding that one speaker better serves the forum's purpose.

Moreover, defendants are *not* similarly situated to WWWY. To begin with, WWWY is not merely acting as a media company in this circumstance, but as an agent of WIAA. Defendants do not argue that the First Amendment would *require* WIAA to permit defendants to stream games if it chose to reserve the exclusive right to stream for *itself*. Rather, the focus of defendants' argument is that having allowed one company to stream its games, WIAA must give all media companies an equal chance to do so. As explained above, this argument incorrectly assumes that the government must treat all private speakers the same in a nonpublic forum. But even assuming that the First Amendment required WIAA to treat all private media companies the same, it is inaccurate to lump WWWY in with other media companies. WWWY does not stream tournaments for use on its own television station or website. Rather, all games streamed by WWWY appear on *WIAA*'s website and

36

nowhere else.  Further, it is undisputed that WWWY receives no revenue as a direct result of that website.  WWWY generates its revenue from other distribution contracts.  In this context, WWWY is more akin to a third-party vendor of services that WIAA does not have the technical skills to provide for itself, than it is just another media company.  Even defendants acknowledge that WWWY, as a production company, can provide many services to WIAA.  Defendants do not even suggest that they are willing or able to provide these services even if WIAA were to give it the chance to do so.


### c.  effect on speech

Finally, plaintiffs' policy does not discriminate on the basis of viewpoint and is not directed at limiting any particular idea from entering into the marketplace.  In most cases in which courts have held that a state actor violated the First Amendment by excluding a speaker from a particular forum, a primary consideration is that the government's conduct: (1) resulted in suppressing an unpopular viewpoint, (2) generally limited the  diversity of views that could be expressed, or (3) created an unacceptable risk of future censorship.  *See Warner Cable Commc'n, Inc. v. City of Niceville*,  911 F.2d 634, 640 (11th Cir. 1990) (cable company's exclusive license with city violates First Amendment because it "imposed a direct limit on the number of speakers and thus prevented an increase in the quantity and variety of speech available to the Los Angeles cable audience"); *Am. Broad. Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1978) (concluding that political candidates violated First Amendment by deciding to exclude one television network from post-election coverage:  "If

choice were allowed for discrimination in a public event of this magnitude in the various media . . . the danger would be that those of the media who are in opposition or who the candidate thinks are not treating him fairly would be excluded.").

Similarly, courts upholding such a restriction on speakers often emphasize that the government is not attempting to suppress any particular point of view. *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229-30 (2000) ("[T]he viewpoint neutrality requirement of the University program is in general sufficient to protect the rights of the objecting students."); *Perry*, 460 *U.S.* at 49 ("There is, however, no indication that the school board intended to discourage one viewpoint and advance another."); *Greer*, 424 U.S. at 838-39 ("[T]here is no claim that the military authorities discriminated in any way among candidates for public office based upon the candidates' supposed political views."); *Arsberry*, 244 F.3d at 564 (upholding government surcharge on telephone usage, noting, "[t]here is no suggestion that the scheme of which the plaintiffs complain is motivated by a desire to limit free speech").

In *Illinois Dunesland*, Judge Posner even suggests that the entire forum analysis could be chucked in favor of a context-sensitive inquiry regarding the purpose and effect of a regulation on speech:

> It is obvious both that every public site of private expression has to be regulated to some extent and that the character of permitted regulation will vary with the differences among the different types of site. . . . The constant is that regulation is not to be used as a weapon to stifle speech.

584 F.3d at 724.

In this case, neither the purpose nor the effect of WIAA's exclusive license with

WWWY is to stifle speech.  Plaintiffs are not attempting to suppress any information about its games from being disseminated to the public or the media; "[n]o part of the [games] has been closed from public scrutiny." *Hastings,* 695 F.2d at 1280.  In fact, the license does not prohibit defendants or anyone one else from saying anything about the games; it simply prohibits them from filming and transmitting the game live.  Further, the only games that defendants are prohibited from streaming are games that WWWY is already streaming, so there is no loss of information to the public.  With respect to viewpoint discrimination, the WWWY's agreement with WIAA and its media policies do not favor or disfavor any particular opinion.  And defendants have adduced no evidence showing that WIAA chose WYYY as a partner because it would provide more favorable coverage, nor that WYYY has engaged in self censorship in order to "please" WIAA.[10]

In some cases, even policies that are neutral on their face may be problematic because of the possible "effect of excluding unpopular or minority viewpoints." *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 593 (7th Cir. 2002).  *See also Chicago Acorn v. Metro. Pier & Exposition Auth.,* 150 F.3d 695 (7th Cir. 1998).  Defendants argue that the exclusive license creates such a risk here, but they fail to explain how.  In fact, defendants fail to identify with any specificity how an exclusive license has or will have any effect on the

---

[10]  Defendants do allude to the possibility that WYYY *might* have an incentive over time to dampen comments that could be viewed as critical of WIAA, its members or its product.  Defendants offer no examples of such favoritism and, while it may exist or develop over time, crediting this possibility as grounds to strike down WIA's policy under the First Amendment would effectively preclude any state actor from entering into an exclusive license.

diversity of views expressed about WIAA events.  This is not surprising in light of the fact that the simple act of live streaming a game on the internet does not necessarily lend itself to the expression of a "popular" or "unpopular" viewpoint.  In light of the generally nonpolitical, nonideological nature of the speech at issue and the absence of any evidence of a history of viewpoint discrimination or censorship on the part of plaintiffs, it is not reasonable to infer that the exclusive license will be used as a weapon for silencing adverse opinions.

Nor can defendants credibly complain that they have no alternatives for news gathering.  *See Perry*, 460 U.S. at 53 ("[T]he reasonableness of the limitations on PLEA's access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place.").  Plaintiffs do not purport to prohibit defendants from reporting on WIAA-sponsored, tournament games.  Defendants are free to publish accounts of the tournaments in newspapers and television, to interview the players and coaches and even to display up to two minutes of live video coverage of any game.   In fact, the internet streaming policy does not prohibit defendants from expressing a single thought, opinion or analysis about a game.  *Post Newsweek Stations-Connecticut*, 510 F. Supp. at 86 (upholding exclusive contract with ABC to broadcast ice skating; noting that "[t]he general public has ready access to the event, the event will be reported by newspaper and radio media without any time or manner restriction, and the plaintiff, itself, may attend and report on the championships") (footnote omitted).

40

**B. Fourteenth Amendment**

The resolution of the First Amendment claim in plaintiffs' favor leaves little room for argument on defendants' equal protection claim. As defendants acknowledge, the standard of review for this claim is whether the esclusive license at issue "rationally further[s] a legitimate state purpose." *Perry*, 460 U.S. at 54. This is not a difficult standard to meet and plaintiffs do so here.

Rational basis review is forgiving of regulations that prohibit more or less conduct than is justified by the government's interest. *Idris v. City of Chicago, Ill.*, 552 F.3d 564, 567 (7th Cir. 2009) ("[R]eview under the rational-basis doctrine tolerates an imprecise match of statutory goals and means. Broad ('overinclusive') categories are valid even if greater precision, and more exceptions or subcategories, might be better."). Under rational basis review, a regulation "will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of" the government's legitimate interest. *McDonald v. Bd. of Election Comm'r of Chicago*, 394 U.S. 802, 809 (1969).

As with challenges under the First Amendment, courts have rejected claims that the government violates the equal protection clause simply by granting an exclusive license despite an incidental effect on speech. *Foto USA, Inc. v. Bd. of Regents of Univ. Sys. of Fla.*, 141 F.3d 1032, 1036-37 (11th Cir. 1998) (public university did not violate Fourteenth Amendment by entering into exclusive contract with photographer for graduation ceremony); *Hubbard*, 797 F.2d at 554-57 (city did not violate Fourteenth Amendment by entering into exclusive advertising contract).

Unlike some of the other cases in which a court upheld an exclusive license, defendants point out that WIAA's decision to give an exclusive license to WWWY did not involve an open bidding process. *See Foto USA*, 141 F.3d at 1037; *KTSP-TAFT Television & Radio*, 646 F. Supp. at 312. While some courts have noted openness in bidding in determining that the government acted reasonably, defendants cite no decision in which a court has suggested that the validity of the license turned on that fact.

WIAA does not have a duty under the Constitution to notify all possible interested parties before it enters into a business agreement. The relevance of an open bidding process is simply that it shows the government is not discriminating on the basis of viewpoint. WIAA may not have held a formal bidding process in this case, but, as discussed above, defendants point to no evidence suggesting that WIAA awarded WWWY the contract for any ideological or political reason. WIAA simply accepted what appeared to be a lucrative proposal from WWWY after no other company expressed interest.

The facts here are little different from those in *Hubbard*, in which a city sold exclusive 10-year advertising contracts "on a first-come/first-served basis." 797 F.2d at 556. In any event, it would have accomplished nothing for WIAA to have a bidding process -- at least as far as defendants are concerned -- because defendants do not suggest that they could or would have made an equal or better offer than WYYY, in terms of services provided or price. To the contrary, defendants' position is that they should not have to pay at all. *See* discussion, *infra*.

Since WIAA has a legitimate interest in raising revenue to support its programs, it

could rationally conclude that it was better served by a guaranteed, annual payment under an exclusive license than by a collection of free-riding media companies.

### III.  Fees

WIAA permits media companies to stream games over the internet when WWWY declines to produce a game, but any interested party must pay WWWY a fee for doing so. Defendants' challenge to this part of plaintiffs' streaming policies requires little discussion.

If the First Amendment does not prohibit WIAA from granting an exclusive license to WWWY to stream tournament games, it is difficult to see how the lesser restriction of allowing defendants access in exchange for a fee could be problematic.[11]   Defendants rely again on cases in which the Supreme Court invalidated taxes and fees imposed on the press or others engaging in free speech activities. *E.g.*, *Follett v. McCormick*, 321 U.S. 573 (1944) (striking down tax on door-to-door bookseller); *Murdock v. Pennsylvania*, 319 U.S. 105 (1943) (striking down license tax on right to solicit door-to-door).

These cases do not stand for the principle that fees may never be imposed on the press or on speech activities.  As the Supreme Court explained in *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622 (1994), "the fact that a law singles out a certain medium, or even the press as a whole, is insufficient by itself to raise First Amendment concerns."  *Id.* at 660 (internal quotations omitted).

---

[11]  The fee is paid to WWWY, rather than WIAA, but neither side argues that the First Amendment should not apply to the fee because WWWY is a private entity, so the court does not consider that question.

The Seventh Circuit has explained in more detail why a contrary position would be unworkable:

> Communications protected by the amendment are . . . frequently made by printing words on paper, yet no one supposes that the consequence is to bring the corporate income tax, when imposed on manufacturers of paper, within the purview of the First Amendment, or even to forbid taxing those manufacturers more heavily than manufacturers of products that are less important as inputs into the production of communications media. Any regulation direct or indirect of communications can have an effect on the market in ideas and opinions, but that possibility in itself does not raise a constitutional issue.  Otherwise the entire tax and regulatory operations of American government would be brought under the rule of the First Amendment.

*Arsberry v. Illinois*, 244 F.3d 558, 564 (7th Cir. 2001) (citations omitted).  Thus, "differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas." *Leathers v. Medlock*, 499 U.S. 439, 453 (1991).

"In those cases in which licensing fees were prohibited," other courts have recognized that "the government was acting in a governmental capacity and was raising general revenue under the guise of defraying its administrative costs."  *Gannett Satellite Info. Network*,  745 F.2d at 774.  In the context of a commercial enterprise (in which raising revenue is an expected and required function of the government) fees are permissible even if they go beyond the government's administrative costs.  *Id.* at 775 (in context of fee on newspapers for placing newspaper racks in train station, "licensing fees are permissible manner restrictions which serve the significant governmental interest of raising revenue for the self-sufficient, efficient operation of commuter lines").

44

As discussed above, plaintiffs' sponsorship of the tournament games is a commercial activity, so the cases defendants cite are not instructive.  The fee here is not directed at a small subset of speakers or even necessarily at the press generally; any party other than WWWY must pay the fee if it wishes to stream a tournament game over the internet. Defendants are paying for the privilege of using a facility leased by WIAA so that they may stream the game on their own websites with the intent of generating advertising dollars. Defs.' Br., dkt. #107, at 1 (conceding that they "hope to someday profit, through increased website traffic and selling advertisements, by streaming tournament events").  Defendants cannot argue plausibly that they have a First or Fourteenth Amendment right to force plaintiffs to open up and reserve space in a WIAA facility simply to provide defendants with a free source of revenue.

Although defendants are not challenging the fees plaintiffs impose for various other privileges, such as media credentials, there is no principled way to distinguish those fees.  If defendants' argument were accepted, even an admission price would be suspect because it is a "tax" on the public's First Amendment right to see the game live.

## IV. Standard for Granting Licenses

The last aspect of the internet streaming policies challenged by defendants is that they give plaintiffs too much discretion in deciding who gets permission to stream games that WWWY declines to produce and in setting the price for such a limited license.  Again, if defendants can outright prohibit defendants from streaming certain games by granting

45

WYYY an exclusive license, there would appear little room left to argue that the First Amendment requires plaintiffs to adopt particular standards for those games not covered by the license. *But see City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 763 (1988) (rejecting argument that "the greater power to prohibit a manner of speech entirely includes the lesser power to license it in an official's unbridled discretion"). Even if it is assumed that the greater power does not necessarily include the lesser, defendants have not shown here that the discretion retained by plaintiffs violates the First Amendment.

Defendants cite several cases in which the Supreme Court concluded that the government violated the First Amendment by failing to publish adequate standards for issuing a license or a fee for access to a public forum. *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130-33 (1992); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 760 (1988); *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969). "[T]he Supreme Court has not yet had occasion to apply the unbridled discretion doctrine outside the context of a traditional public forum," *Child Evangelism Fellowship of MD, Inc. v. Montgomery County Public Schools*, 457 F.3d 376, 386 (4th Cir. 2006), but the Seventh Circuit has assumed that the doctrine may apply even to nonpublic forums. *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572-73 (7th Cir. 2001).

This does not mean, however, that the same requirements apply in every instance in which the government restricts access to its property. *Child Evangelism Fellowship*, 457 F.3d at 386 (rejecting proposition "that the unbridled discretion analysis is precisely the same when a limited public or nonpublic forum, rather than a traditional public forum, is

involved"); *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1323 (Fed. Cir. 2002) ("We do not believe, however, that we are compelled to apply the unbridled discretion doctrine mechanically . . . without inquiry into the characteristics of the relevant forum."). "Because 'selectivity' and 'discretionary access' are defining characteristics of non-public fora, the requirements are more lenient in that context."  *Ridley*, 390 F.3d at 95.  Again, the key question is whether there is an appreciable risk that the lack of more specific standards will lead to the censorship of a particular viewpoint. *Child Evangelism*, 457 F.3d at 386 ("The danger of such boundless discretion, therefore, is that the government may succeed in unconstitutionally suppressing particular protected speech by hiding the suppression from public scrutiny."); *DeBoer*, 267 F.3d at 574 ("ambiguity in the [policy] provides too great a risk that it could be used to engage in prohibited censorship of speech"). When "there is no serious concern about either notice or chilling effects," more specific standards are not required. *Ridley*, 390 F.3d at 94.

Turning to plaintiffs' policy, defendants challenge one sentence stating that "[a]ll permission granted, policies enforced and fees required will be at the sole discretion of the WIAA and the rights holder."  Defendants interpret this to mean that plaintiffs may deny a request for any or no reason.  Plaintiffs disagree, arguing that the provision must be read in context of the entire policy, which "set out in detail the standards expected from media organizations who seek to . . . transmit live broadcasts of tournament events." Pls.' Br., dkt. #86, at 13.  Thus, plaintiffs' view is that anyone who complies with the media policies will be granted permission to broadcast a game, but that plaintiffs have the "sole discretion" to

47

determine whether an applicant has complied with those policies.

Plaintiffs' view is supported by history. It is undisputed that plaintiffs have never rejected a request to produce an event that WWWY declined. *Cf. Griffin*, 288 F.3d at 1326 ("Even unwritten speech policies may survive constitutional challenge if uniformly enforced.") Perhaps even more important, defendants have identified no reason to believe that, in the future, plaintiffs will begin issuing licenses to media companies on the basis of viewpoint. *Gannett*, 745 F.2d at 776 (declining to require transportation authority to publish standards for granting licenses to place newsracks in stations because "there is no evidence or finding that [the transportation authority] has arbitrarily denied licenses or imposed unreasonably discriminatory terms on anyone, or that there is any threat of such conduct").

In fact, defendants fail to identify how "viewpoint" would be relevant to a request to broadcast a game. In the cases cited by defendants, the court was concerned about a risk that the government would discriminate on the basis of the viewpoint the applicant wished to express *in the forum at issue.* In this case, streaming a game in and of itself does not necessarily involve the opinions of the media company. Thus, the only way that a media company's viewpoint could become relevant would be if plaintiffs disapproved of commentary that had accompanied a previous broadcast or more generally disapproved of positions taken by the media company. In light of plaintiffs' consistent acceptance of requests to stream games in the past and defendants' failure to adduce any evidence that suggest a change in the future, court-ordered relief is premature. *Griffin*, 288 F.3d at 1326

("We . . . deny Mr. Griffin's petition to invalidate [the regulation] because we do not believe a real and substantial threat to expression flows from the alleged unbridled discretion vested in" defendant.)  In the event that defendants *are* denied a license in the future for a reason that violates the First Amendment, they are free to bring an as-applied challenge at that time.

With respect to the fee charged, defendants argue that plaintiffs have not published particular rates and that nothing stops plaintiffs from charging whatever they want.  But defendants have adduced no evidence that plaintiffs have charged unreasonable rates to anyone.  Currently, the rate is $250 for one camera and $1500 for multiple cameras, rates that defendants do not claim to be unreasonable.  Although these rates are not published, plaintiffs have provided the factors they used in calculating the amount, including the fees charged by other state athletic associations.  Defendants may be correct that plaintiffs could change their rates if they chose, but this would be true regardless whether plaintiffs published their rates.  Ultimately, "[t]he marketplace provides protections against unreasonable licensing fees." *Gannett*, 745 F.2d at 775 n.4.  Again, defendants have provided no reason to believe that plaintiffs will begin charging exorbitant fees for streaming.

## V.  Copyright

Finally, defendants assert as a counterclaim their copyright in four WIAA-sponsored tournament games streamed over the internet without the consent of plaintiffs in 2008.  One problem with this claim is that it is premised on an argument that "because it is a state actor, WIAA cannot condition access on such restrictions or discriminate in favor of its exclusive

49

streaming partner, WWWY." Defs.' Br., dkt. #76, at 32. Defendants appear to agree that private sponsors of events may require attendees to surrender upon admission any intellectual property rights they might have in a broadcast of the game. *Id.* at 36 ("The Brewers can indeed establish entry restrictions by fiat to prevent a newspaper from broadcasting a Brewers game."). The only reason WIAA is not entitled to do the same thing, according to defendants, is that the "First and Fourteenth Amendments do not permit it." *Id.* at 32. Defendants do not explain this statement, but presumably they mean to repeat the arguments made in other parts of their briefs that the exclusive license with WWWY is unconstitutional. Because the court has rejected that argument, this claim fails as well.

## ORDER

IT IS ORDERED that

1.   The motions to "strike" filed by plaintiffs Wisconsin Interscholastic Athletic Association and American Hi-Fi, Inc., dkt. ## 72 and 98, are DENIED as unnecessary.

2.   The motion for summary judgment filed by defendants Gannett Co., Inc. and Wisconsin Newspaper Association, Inc., dkt. #31, is DENIED.

3.   The motion for summary judgment filed by plaintiffs, dkt. #49, is GRANTED.

4.   It is DECLARED that plaintiff American Hi-Fi's exclusive license with plaintiff WIAA for streaming WIAA tournament events over the internet does not violate the free press clause of the First Amendment or the equal protection clause of the Fourteenth Amendment. It is further DECLARED that plaintiffs do not violate defendants' rights under the free press clause by charging a fee for streaming games over the internet or failing to include more specific standards than those included in WIAA's 2009-2010 Media Policies for granting permission to defendants for streaming games.

5.    It is further DECLARED that defendants have not acquired a copyright with respect to the four tournament games they streamed without plaintiffs' permission in 2008.

Entered this 3rd day of June, 2010.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

51